**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN SAMN, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>INDIA GLOBALIZATION TECHNOLOGY, RAM MUKUNDA, CLAUDIA GRIMALDI, and ROHIT GOEL,<br><br>    Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Jonathan Samn ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by India Globalization Capital, Inc. ("India Globalization" or the "Company"), as well as media and analyst reports

about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded India Globalization securities from October 25, 2017 through October 29, 2018, both dates inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company conducts business and maintains principal executive offices in this District.

5.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying PSLRA Certification, acquired India Globalization securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant India Globalization operates through two segments, Legacy Infrastructure and Medical Cannabis Based Alternative Therapies. The Company purports to engage in the development and commercialization of cannabis-based therapies to treat Alzheimer's, pain, nausea, eating disorders, several end points of Parkinson's, and epilepsy in humans, dogs, and cats. The Company is a Maryland corporation with principal executive offices located in Bethesda, Maryland. During the Class Period, India Globalization securities traded on the New York Stock Exchange American ("NYSE") under the symbol, "IGC." The Company's stock now trades over-the-counter ("OTC") under the ticker symbol, "IGCC."

8.      Defendant Ram Mukunda ("Mukunda") has been the Company's Chairman, Chief Executive Officer ("CEO"), and President since April 2005.

9.      Defendant Claudia Grimaldi ("Grimaldi") has served as the Company's Vice President and Principal Financial Officer since May 2018.

10.     Defendant Rohit Goel ("Goel") has served as the Company's Principal Accounting Officer since September 2017.

11.     Defendants Mukunda, Grimaldi, and Goel are herein referred to as "Individual Defendants."

12.     Collectively, Defendant India Globalization and Individual Defendants are herein referred to as "Defendants."

13.     Each of the Individual Defendants:

3

a.  directly participated in the management of the Company;

b.  was directly involved in the day-to-day operations of the Company at the highest levels;

c.  was privy to confidential proprietary information concerning the Company and its business and operations;

d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

14.    India Globalization is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

15.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to India Globalization under *respondeat superior* and agency principles.

**<u>SUBSTANTIVE ALLEGATIONS</u>**
**<u>Background</u>**

16.    According to India Globalization, it entered the infrastructure industry in India in

2008. In 2009, it expanded into the commodity business, trading iron ore, cement, aggregate, and other materials. In late 2013, India Globalization began to target the U.S. cannabis industry. In 2018, India Globalization had announced it filed a patent for the formulation of Hyalolex, a cannabis-based supplement designed to treat symptoms of Alzheimer's disease.

### Defendants' False and Misleading Class Period Statements

17.     On October 25, 2017, India Globalization issued a press release entitled, "IGC to Distribute its Formulations in Germany in Early 2018," announcing that it had entered into a Memorandum of Understanding with MediCann Handels GmbH for the import and distribution of India Globalization's cannabinoid-based therapies to pharmacies in Germany. The press release states, in relevant part:

**IGC to Distribute its Formulations in Germany in Early 2018**

October 25, 2017 08:00 ET | Source: India Globalization Capital

BETHESDA, Md., Oct. 25, 2017 (GLOBE NEWSWIRE) -- India Globalization Capital, Inc. (NYSE MKT:IGC) announced that it has entered into a Memorandum of Understanding (MOU) with MediCann Handels GmbH, a company based in Hamburg Germany, for the import and distribution of IGC's cannabinoid based therapies including IGC-AD1 (Hyalolex) to pharmacies in Germany.

MediCann plans to distribute to pharmacies, apothecaries and other licensed retail outlets that are legally allowed to sell cannabinoid-based products. Under the current MOU, MediCann will provide the capital required for the transportation, import, storage, sales and marketing of products intended for the German market. The agreement is subject to standard closing conditions such as due diligence relating to satisfactory licensing and product procurement.

"There are many benefits to developing a strong presence in the German pharmacy market including, a favorable regulatory environment and reimbursement from health insurance providers. The agreement with MediCann is the first step in the commercialization process of our therapies, as we work out the logistics of how to efficiently deliver our products to Germany," states Ram Mukunda, CEO. "We are glad to add the products of IGC to our portfolio. With these products we will have a unique selling point in the German market," states Carsten Siegemund, CEO of MediCann.

5

18.     Bitcoin is a popular type of cryptocurrency. Blockchain is the technology used for verifying and recording Bitcoin transactions. In other words, blockchain enables the existence of bitcoin and other cryptocurrencies.

19.     On December 26, 2017, when bitcoin futures traded near all-time highs, India Globalization issued a well-timed press release entitled, "India Globalization to use Blockchain to Address Issues Specific to the Medical Cannabis Industry," stating the Company would "leverage its existing team of technology and healthcare experts to develop methods of utilizing blockchain in areas such as product identification assurance (PIA)." The press release states, in relevant part:

> **India Globalization Capital to use Blockchain to Address Issues Specific to the Medical Cannabis Industry**
>
> December 26, 2017 08:00 ET | Source: India Globalization Capital
>
> BETHESDA, Md., Dec. 26, 2017 (GLOBE NEWSWIRE) -- India Globalization Capital, Inc. (NYSE American:IGC), today announces that it will leverage its existing team of technology and healthcare experts to develop methods utilizing blockchain in areas such as product identification assurance (PIA).  According to a recent study that was published in JAMA and detailed on www.pennmedicine.org, nearly 70% of all cannabidiol products sold online are either over or under labeled.
>
> "We understand the unique challenges facing the cannabis industry and believe that our team has the expertise to be the first to create meaningful solutions to address these issues using distributed ledgers inherent in blockchain technology. As we work to develop blockchain in the rollout of Hyalolex, our goal would be to establish a universal cannabis platform applicable to solving multiple industry challenges facing dispensaries and consumers. This would include addressing issues such as transactional difficulties, inadequate product labeling, product identification assurance (PIA) and product origin assurance," stated Ram Mukunda, CEO.

20.     On March 26, 2018, India Globalization issued a press release entitled, "Puerto Rican Alzheimer's Patients to Be First in U.S. to Obtain Cannabis-Based Relief," stating, "[w]e are very pleased to work with the DaMa Pharmaceutical team to bring Hyalolex to Puerto Rico,

which has a long history of developing premier pharmaceutical products." The press release

states, in relevant part:

### Puerto Rican Alzheimer's Patients to Be First in U.S. to Obtain Cannabis-Based Relief

March 26, 2018 09:44 ET | Source: India Globalization Capital

BETHESDA, Md. and SAN JUAN, Puerto Rico, March 26, 2018 (GLOBE NEWSWIRE) -- India Globalization Capital, Inc. (NYSE American:IGC) – Alzheimer's patients in Puerto Rico will be the first in the United States to obtain Hyalolex, IGC's proprietary cannabinoid based formulation aimed at relieving many of the symptoms of Alzheimer's Disease, such as agitation, anxiety, sleep disorder, as well as caregiver distress, among others. Pursuant to an agreement between IGC and DaMa Pharmaceutical and its affiliates, Hyalolex will be on the shelves in April, and available to patients in ten of Puerto Rico's 30 dispensaries, including the two premier dispensaries in San Juan, the largest city in Puerto Rico. Under the licensing terms DaMa will help produce Hyalolex in Puerto Rico, and market Hyalolex to medical dispensaries and end users. Hyalolex will be prescribed as a liquid supplement in twice-daily doses for mild to moderate Alzheimer patients, and thrice-daily doses for moderate to advanced patients.

"We are very pleased to work with the DaMa Pharmaceutical team to bring Hyalolex to Puerto Rico, which has a long history of developing premier pharmaceutical products," said Ram Mukunda CEO of IGC. He noted that the Puerto Rican government has been a supporter of a comprehensive medical cannabis program. "We are proud to be a contributor to Puerto Rico's economic development and to the wellbeing of its Alzheimer's patients", he said. According to alz.org, Hispanics are approximately one and one-half times as likely to have Alzheimer's as non-Hispanic whites.

"This is a decisive step in delivering our cannabis intellectual property to patients, after many years of development. It is particularly important as part of our effort to establish a distribution network to productize our IP," Mukunda said.

This partnership represents a significant opportunity to provide those afflicted with Alzheimer's with potential relief from a very difficult diagnosis and ease the burden of their caregivers who attend to them. It also represents a significant opportunity to collect data on Hyalolex's performance within a diverse patient set", said Mukunda. IGC will deploy a QR code-based product assurance, information dissemination, and data collection system as a step towards a more robust block chain-based product assurance system.

21.      On June 21, 2018, the Company filed a Form 10-K with the SEC, which provided

the Company's financial results and position for the fiscal year ended March 31, 2018 (the "2017 10-K"). The 2017 10-K was signed by Defendants Mukunda, Grimaldi and Goel. The 2017 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Mukunda, Grimaldi and Goel attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2017 10-K stated the Company's disclosure controls and procedures, and internal controls over financial reporting were effective.

22.     On September 25, 2018, a mere weeks before cannabis for adult recreational use was to be legalized in Canada, India Globalization issued another well-timed press release entitled, "IGC to Enter the Hemp/CBD-Infused Energy Drink Space[,]" announcing it had executed a distribution and partnership agreement to, among other things, market Cannabis-infused energy drinks in Canada. The press release states, in relevant part:

**IGC to Enter the Hemp/CBD-Infused Energy Drink Space**

September 25, 2018 08:39 PM Eastern Daylight Time

BETHESDA, Md.--(BUSINESS WIRE)--India Globalization Capital, Inc. (NYSE AMERICAN: IGC) announces today that it has executed a distribution and partnership agreement for several products including a sugar free, energy drink called 'Nitro G'.

IGC will pay 797,000 shares of restricted, unregistered, common stock, for a 10-year agreement, with an option for multiple 5-year extensions, for the rights to market the products in the U.S., Canada, Mexico and South America and exclusive global rights to all developed CBD-infused products.

IGC plans to create a branded, hemp/CBD-infused version of the formulation that addresses market demand for energy drinks with the inclusion of healthy properties derived from hemp including CBD.

"According to a Grand View Research forecast, the global energy drinks market is projected to be almost $85 billion by the year 2025, with non-alcoholic beverage sales expected to account for a significant portion of the market. This represents a unique opportunity for the development and commercialization of a

CBD-infused, sugar free energy beverage," stated Ram Mukunda, CEO of IGC.

"By combining the experience of IGC with Hyalolex with the manufacturer in Malaysia, we potentially bring together unique expertise in microencapsulation, solubility, infusion, controlled dose delivery, and sugar free processes, among others. This will help introduce an exciting CBD-infused energy drink to the market and the acquired knowledge base can be further leveraged to diversify the delivery method for IGC branded products including Hyalolex, our flagship product for patients suffering from Alzheimer's," continued Mukunda.

This transaction is particularly timely given the language of the 2018 Farm Bill that currently addresses potentially legalizing, on a federal level, industrial hemp and products derived from it, including hemp oil that contains CBD.

23.    The statements referenced in ¶¶17-22 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) India Globalization's business model was in a state of change in order to lure potential blockchain and cannabis investors; (2) India Globalization had overstated the benefits of its relationships with manufacturers, partners, and distributors in order to inflate the Company's potential commercial success in the blockchain and cannabis markets; (3) as a result, the NYSE delisted India Globalization's shares from their exchange; and (4) consequently, Defendants' statements about India Globalization's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Slowly Begins to Emerge**

24.    On October 4, 2018, approximately one hour before market-close, *MarketWatch* published an article stating, *inter alia*, that India Globalization made suspicious and/or materially false and/or misleading statements concerning its: (i) well-timed blockchain and cannabis-

infused energy drink initiatives; (ii) ability to utilize a Malaysian manufacturer to transition into producing cannabis-infused energy drinks; and (iii) partnerships with Dama Pharma and a German distributor, MediCann Handels GmbH. The article states, in relevant part:

**10 potential red flags for investors in IGC, the pot stock that jumped 1000% in three months**

Published: Oct 4, 2018 2:41 p.m. ET

Stock has rocketed since the company announced it planned a line of CBD-infused drinks, but details remain scant

*     *     *

A review of the company's IGC, -21.13% history and regulatory filings has uncovered an alarming number of red flags that undermine some of the claims made by the company and demonstrate the importance of due diligence when investing.

The stock's move came after the company announced its plan for a line of CBD-infused drinks, or those containing cannabinoids, ingredients in cannabis that are said to have health benefits. With Canada gearing up for full legalization of cannabis for adult recreational use on Oct. 17, the sector has become a hot market for speculators, with investors jumping on every announcement of a planned product, alliance, distribution agreement or deal.

IGC has benefited — its market capitalization has ballooned to $295 million on Thursday from just $78 million on Sept. 25, the day before the drinks announcement.

In its most recent quarterly earnings report, IGC posted a loss of $512,296 on revenue of $1.5 million for the three months to end June. Cost of revenue came to $1.4 million, while SG&A costs came to $553,645, which exceed its revenue.

MarketWatch has spent several days calling and emailing IGC, its executives and the scientists whom it names as advisers on its website. Founder and Chief Executive Ram Mukunda returned a call on Wednesday, before asking for time to read the questions we had emailed him with the promise he would call back. On Thursday, the company said it would provide answers to our questions. It has not done so at this time.

Here are 10 potential red flags for investors to be aware of:

Made in Malaysia?

*In the release announcing the plan for CBD-infused drinks, IGC indicates it will work with a manufacturer in Malaysia, but that country has a mandatory death sentence for cannabis possession and has no medical-marijuana program.*

*"Marijuana or any form of products including CBD oil is illegal in Malaysia," Erny Sabrina Mohd Noor, counselor for agriculture at the Malaysian Embassy in Washington, D.C., told MarketWatch.*

History of pivots

*IGC, which started life in 2005 as a blank-check company, has a history of pivoting to new businesses as they become popular and releasing press releases to highlight those business-plan shifts.*

*The company's IPO prospectus said that it aimed to acquire or merge with businesses operating in India, to take advantage of the potential of that market. In 2007, it began to acquire infrastructure assets in Asia and later started trading commodities such as steel and iron ore, leasing heavy construction equipment and managing real estate in Malaysia, according to its website. Today, the SEC-registered area of business is described as "wholesale electronic parts and equipment."*

*In 2013, the company started to look into the cannabis industry, where it now claims to be working on treatments for serious diseases including Alzheimer's and Parkinson's, as well as anxiety and sleep disorders.*

*However, a review of its regulatory filings reveals that it has assigned very little funding to research and development — roughly $150,000 a year — and none to clinical studies or any of the other steps needed to win U.S. Food and Drug Administration approval.*

*A look at press releases from the last year shows a clear pattern of repeatedly entering the latest hot market. In late 2017, that was blockchain, while last month it was cannabis that helped push or support the stock above the $1 threshold. The latest announcement appeared to be timed with a sale of shares.*



The strategy-pivot approach to capturing investor interest was used most dramatically by Long Island Iced Tea Corp., which caused a stir on Dec. 21, 2017, by announcing it was changing its name to Long Blockchain Corp. LBCC, +12.46%, sending the stock up 183%. The news came three days after bitcoin futures XBTV8, +1.91% started trading, at prices above $20,000.

From the MarketWatch archives: Nasdaq to delist Long Blockchain Corp., underlining fading bitcoin fervor

***Less than a week later, IGC followed with its own blockchain initiative, saying it would use the technology to address "issues" in areas such as product identification. The stock shot up 91% to $1.26 on Dec. 26, the first close above the $1 mark since July 2014.***

***On Dec. 29, a proposal to approve the grant of 1.9 million shares of stock to "current and new employees, advisers, directors and consultants by the board of directors" passed a shareholder vote.***

In mid-September, Level Brands Inc.'s stock LEVB, -6.29% more than doubled in four days, just before the company announced on Sept. 21 the online launch of five new cannabidiol (CBD) products under the Kathy Ireland Health & Wellness brand. The stock ran up as much 24% during the day of the announcement, before reversing course to close the session down 12%.

***Four days later, IGC said it was entering the market for CBD-infused energy drinks, with "plans to create a branded hemp/CBD-infused version of the formulation that addresses market demand for energy drinks with the inclusion of healthy properties derived from hemp including CBD." In other words, the product, called "Nitro-G," was still in the planning stages. Still, the news helped kick off a near sixfold rise — the stock ran up 458% — over the next five sessions.***

***On cue, the company disclosed late Tuesday it had completed its at-the-market offering of 5.65 million shares at a weighted average price of $5.30, which was more than double the closing price of $2.33 on Sept. 25, when the offering commenced. Coincidentally, Sept. 25 was the day IGC said it was entering the market for CBD-infused energy drinks.***

<u>A history with the SEC</u>

IGC went public on May 13, 2005, led by Ram Mukunda, who has since served as chairman of the board, CEO and president. Mukunda was previously founder and CEO of a company called Startec Global Communications, according to a biography on his company website. The bio fails to disclose that Startec went bankrupt in 2001, having defaulted on a $9.6 million interest payment.

IGC started in 2005 with $200,000 in assets, a $100,000 loan payable to Mukunda and an obligation to pay Mukunda's company, Integrated Global Network LLC, an administrative fee of $7,500 a month for office space and general and administrative services. John Cherin, an Arthur Andersen alumnus, served as chief financial officer until he was replaced by Rohit Goel and Shajy Mathilakathu as co-principal accounting officers on Sept. 29, 2017.

Claudia Grimaldi became the company's "principal financial officer" in May 2018.

The company has attracted a lot correspondence from the SEC. In March 2017, the SEC wrote to ask about a 2009 transaction with Bricoleur Capital Management, an investment adviser. The loan from Bricoleur to IGC has been renegotiated several times.

IGC's financial statements filed with the SEC as of June 30, 2017, said the company had issued 90,000 shares valued at $36,600 to Bricoleur Partners L.P. against the outstanding $1.8 million promissory note as repayment of interest. Bricoleur's SEC registration was terminated in December 2012, and its license was revoked by the state of Florida in 2015.

IGC has received nine late-filing notices from the New York Stock Exchange in just the past three years, prompting the SEC to ask over and over when it is going to comply with the rules. IGC received another notice of delisting from the NYSE in October 2017 and had to ask the SEC for an extension to file and hold a shareholder meeting. The company had still not held a shareholder meeting by December 2017, and it got another notice from the SEC asking when it would comply with its exchange's rules.

The company finally caught up on its filings, averting a NYSE delisting by issuing its annual report and 10K on June 21 and holding a shareholders meeting on August 6.

<u>Insiders make the most money from stock gains</u>

The biggest beneficiaries of the news that's pumped up the stock are IGC's executive officers, as the following table shows:



Six of the top seven shareholders, who own a combined 16.5% of all shares outstanding, are IGC's six executive officers and directors, as named in the company's latest annual report filing.

Of the rest of the outstanding shares, 0.9% is owned by institutional investors and 82.6% is owned by "unknown" investors, which, according to FactSet, can include individual investors, mutual funds not covered because of nondisclosure laws, institutional managers managing less than $100 million and foreign-based institutional investors.

The sole institutional investor in the top seven is hedge fund Citadel Advisors LLC, which owned about 115,000 shares as of June 30, or 0.3% of the shares outstanding, according to the most recent 13F filing with the SEC. That's down from about 149,000 shares as of the end of May, and up from zero shares at the end of 2017.

<u>IGC's business partners have issues</u>

*__The Dama Pharma company in Puerto Rico appears to have been created just in time for an IGC press release, headlined "Puerto Rican Alzheimer's Patients to Be First in U.S. to Obtain Cannabis-Based Relief" on March 26, 2018. It was incorporated three days before the press release was sent out.__*

*__DaMa Pharma says it is "a medical cannabis manufacturing company, and a Clinical Research Organization (CRO) for conducting clinical trials on cannabis-based products" and has a LinkedIn profile, but its website is incomplete. DaMa Pharma's only employee is Stephen Inglis, who is also CEO of a company called InPortal USA.__*

*InPortal is a facilitator, providing "Compliant Market Access through an equity capital markets (ECM) and a debt capital markets (DCM) platform with a dedicated public corporate landing site and controlled investor access to a deal data room."*

IGC shares also trade on the Boerse Frankfurt, Stuttgart, and Berlin Exchanges under the ticker symbol "IGS1" and on the Boerse Frankfurt, Boerse Berlin and Boerse Stuttgart under "XETRA2," according to the company's filings.

*IGC's German distribution partner was said to be ready to "distribute its formulations in Germany in early 2018," according to a press release from October 2017.*

*Between Oct. 25, when the press release was issued, and Nov. 3, IGC's Mukunda sold 200,000 shares of IGC stock. There was no further mention in SEC filings of this business partnership and no further press releases.*

*Medicann is a German "medical marijuana retailer website," and its listed CEO is Carsten Siegemund. Medicann was created with just 25,000 euros in capital on May 31, 2017.*

*A search of the site finds no mention of the IGC product Hyalolex, which it claims can treat symptoms of Alzheimer's disease.*

*The site itself is a work in progress, since the map shows the center of Central Park in New York, and the answers to FAQ questions are "lorum ipsum" — filler text often used in place of the eventual content of new website templates and other yet-to-be-published materials.*

*Cartsten Siegemund helps distribute products for other penny-stock companies besides IGC. One press release touts a 3.7 million euros distribution agreement, pretty big business for a company started six months earlier with a €25,000 investment.*

(Emphasis added).

25.    On this news, shares of India Globalization fell $2.44 per share or over 27.5% to close at $6.41 per share on October 4, 2018, damaging investors. The Company's shares continued to fall $2.36 per share the following trading day or over 36.8% to close at $4.05 per share on October 5, 2018.

26.    On October 29, 2018, the NYSE announced the delisting process would

commence for India Globalization's stock traded on its exchange. The NYSE commenced delisting because "the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical[.]" The press release states, in relevant part:

> NYSE to Suspend Trading in India Globalization Capital (IGC), Commence Delisting Proceedings
>
> NYSE American LLC ("NYSE American" or the "Exchange") announced today that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc. (NYSE: IGC) — ticker symbol IGC —from the Exchange. Trading in the Company's common stock on the NYSE American will be suspended immediately.
>
> NYSE Regulation commenced delisting proceedings against the Company pursuant to Section 1003(c) (i) of the NYSE American Company Guide (the "Company Guide") which states that where the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical, it shall not be considered an operating company for the purposes of continued trading and listing on the Exchange.
>
> NYSE Regulation also considered Section 1003(f) (iii) because the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest. Section 1009(a) (ii) of the Company Guide states that it is necessary and appropriate for the protection of investors to immediately suspend trading in the Company's common stock.
>
> The Company has a right to a review of staff's determination to delist the common stock by a committee of the Board of Directors of the Exchange. NYSE American will apply to the Securities and Exchange Commission to delist the Company's common stock upon completion of all applicable procedures, including any appeal by the Company of the NYSE Regulation staff's decision.

27.     On this news, shares of India Globalization were halted.

28.     The next day, October 30, 2018, shares of India Globalization began trading OTC under the ticker symbol "IGCC." The stock price plummeted $1.93 per share or over 77.5% to

close at $0.56 per share on October 30, 2018.

29. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

30. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of India Globalization during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

31. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

36.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the NYSE, and was covered by multiple analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

37.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

38.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

39.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

40.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

41.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

43.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

44.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

45.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

46.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

47.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

48.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

<u>**COUNT II**</u>
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

49.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

50.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

51.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

52.     Because of their positions of control and authority as senior officers, the

Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

53.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

54.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 2, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim_____
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com

*Counsel for Plaintiff*